We're here for oral argument in Case No. 18-10565, Richard Sealey v. Warden. And we'll start with Ms. Benton. May it please the Court, Jill Benton for the petitioner, Appellant Richard Sealey, here with Shauna Brown and Jesse Gabriel, pro bono counsel. With the Court's indulgence, I'd like to focus my argument today on trial counsel's failure to present sentencing phase evidence, and then to the extent that time allows, the trial court's refusal to grant a brief continuance of the penalty phase proceedings. Subject, of course, to any questions the Court may have, we would rest on the briefs for the phoretic claims and the jury verdict claims. Sure. Thank you. Trial counsel, in this case, had two clearly delineated goals for the sentencing phase. The first was to establish residual doubt. Trial counsel continued to press questions about the reliability of the testimony of Mr. Sealey's co-defendants who testified pursuant to a negotiated agreement. They pointed out the lack of physical evidence directly establishing Mr. Sealey as the assailant. The second goal was to, quote, humanize Mr. Sealey. As Mr. Beal told the trial court while the sentencing phase proceedings were ongoing, he wanted to present, quote, Mr. Sealey's family, his background, and specific items of mitigation evidence, such as advice that Mr. Sealey had given to his younger relatives. And yet, counsel placed virtually no evidence in support of that second goal in front of the jury. For that matter, they didn't even place all the evidence of residual doubt in front of the jury, if we consider the polygraph testimony. But had counsel presented the jury with any evidence concerning Mr. Sealey's background and loved ones, it is reasonably likely that the outcome would have been different. So unpack that for us. Why do you say that? That seems to me sort of the $64,000 question. So why is it that you say that? Well, several reasons. And we can talk about what those reasons are, and then we can get to the unreasonableness of the state habeas court's order to the contrary. First, we know from the jurors themselves, the first vote in this case in the jury room on sentencing was six for life without and six for death. We have one juror who testified, quote, I know from our deliberations that some members of the jury, me included, were waiting for the defense to give us some reason not to give Richard Sealey the death penalty. I was surprised they didn't get just one relative, a friend, somebody to get up and say this is a person, this person is somebody I care about, please don't kill him. So I'll have to confess, like, I found that testimony pretty compelling. But then I looked into it, and it seems like Strickland sort of excludes that sort of what it calls sort of idiosyncratic decision-making process kind of evidence that says, look, this is an objective standard. So how far can that testimony get you? So two points on that, Judge Newsom. First, you're right, it's an objective standard, but this tells us objectively how far the defense got with residual doubt, right? They got the jury to the point where they were receptive to a life sentence. Second, the jurors are telling us with their own mouths what the case authorities say, which is when trial counsel doesn't present any evidence of any kind in mitigation, that it sends a message that the defendant is irredeemable, that you're sending a specific message by doing nothing. And the jurors are saying, yep, we got the message. You say in your brief that Mr. Steeley's family members were ready to testify and beg for his life. Is there testimony to back that up? Because I'm concerned the evidence doesn't go that far. It's more in the nature of, you know, the nephew saying he once gave me good advice and he laughed a lot, and it seemed to me the other family member's testimony was similarly kind of stopping short of that. So Mr. Tutine, the nephew, does say that in those words. He says it in his testimony. Don't remember if it's the affidavit or his live testimony at the state hearing, but he says I knew what was at stake and I wanted to be there to speak up for him. He says it in so many words. That's why I wanted to be there. My concern is whether there's a disconnect between what the juror testimony was and what the family members actually would have said. I mean, the sum and substance of the juror testimony is we can't believe that nobody stepped forward to speak up on behalf of this man, right? And here are people who are ready to do so. You know, I don't know if we need to put it in terms of beg for his life, the sort of traditional testimony that comes from, say, a defendant's parents. But you have relatives who want to say, this is somebody I love, this is somebody I care about, this is someone I have a fond memory of, someone I don't remember is a monster, so that there can be some kind of counterbalance to the state's aggravation, you know, that goes for a full day and then is answered by nothing. By the way, not even by defense counsel. Defense counsel doesn't stand up and say, please don't kill him. Is there any similar authority where you have a situation like this of jurors saying like if I'd heard anything? Because it seems to me in most of our precedent, you're simply weighing the mitigation evidence against the aggravating factors. Well, what the cases do say is when the mitigating evidence is very thin or non-existent at trial, that that sends a message, that that weighs substantially. The difference between zero witnesses and one witness is substantially different than the difference between nine witnesses and ten. And you know, that goes all the way back to 40 years of capital case jurisprudence. The idea that mitigating evidence has to go to the sentencer, something about that defendant has to go to the sentencer, you know, Eddings v. Oklahoma, Lockett, those are all cases that say that this is a constitutionally indispensable piece of the process. And to your point, Your Honor, I do understand that those aren't Strickland cases. But what they are saying is when you keep this kind of evidence from the sentencer, you basically foreclose the possibility of a life sentence. You are creating an unconstitutional risk that death is going to be the result when it's not appropriate. You said that there were some relatives who were willing and able to testify on Mr. Seeley's behalf, but isn't it also true that some of the most relevant were not? And so there was, I think, one of the sisters who said she was not going to be able to say anything favorable. She didn't want him put to death, but she wasn't going to be able to say anything favorable on his behalf. And then there was the other one, I think, the other sister who said that she just couldn't be bothered or didn't want to be bothered. I'm summarizing with being called as a witness. And then you have the whole dynamic of Mr. Seeley informing his counsel that he didn't want his mother involved, for lack of a better term. How do you factor all of that into the mitigating evidence equation? So there's a lot there. As to your first point, yeah, that's correct. His sister Geraldine, which is his only full-blooded sibling, declined to come to Georgia. She lives in Pennsylvania. There is another sister in the mainland who lives in Boston who was more than a full generation older than Mr. Seeley. She was the mother's daughter by prior relationship. And when trial counsel called her, she said, I didn't really know him because I didn't grow up with him. I grew up somewhere completely different. So there's those two relatives. There's a third sister on St. Croix the trial counsel spoke to, Pauline. And Pauline says, so long as it doesn't interfere with my work as a teacher, I will be there. That's memorialized in trial counsel's contemporaneous notes. And that is corroborated by her testimony in the state habeas court, saying that so long as they could arrange it so that I would have the availability to be there, I would be there. Mr. Seeley's trial was in August. So presumably she would have been available. Her testimony in the state habeas court says they called me at the very last minute. And that is consistent with trial counsel's contemporaneous notes. They're calling mitigation witnesses that they want to come from St. Croix in the middle of the trial proceedings. As late as the morning of the sentencing phase aggravating evidence, Mr. Abbeel is referencing mitigating witnesses, plural, that he wants to bring up from St. Croix. So there is some intent, and then there's evidence that they don't get in touch with them in time. So maybe in a way, back to Judge Pryor's question, the substance of the testimony that you're complaining wasn't brought forward, I'm not suggesting that it's a necessary condition, but it doesn't, for instance, look like Wiggins or Rumpia or something like that. And instead, I mean, it's sort of double-edged sword-ish, right? I mean, like you've got the normal childhood, three-bedroom house, these European vacations, Disney World vacations. I mean, it doesn't exactly paint the sort of picture that we're accustomed to seeing in a capital case like this. To your point, no, it does differ from that kind of evidence. It's not abject abuse or abject poverty. Just sort of to clarify the record, the testimony about trips to Europe and Disney World, that's not in any of the testimony. That is in trial counsel's notes from their interview with Geraldine, the sister who declined to come to trial. So that's not part of the penalty phase evidence. The evidence is that he had no parenting of any kind. He had an unstable mother who was disengaged from his upbringing, and that he then, you know, she abruptly moves the family to the Bronx, where he does not thrive, gets, you know, and progressively his grades go down. He's struggling. He comes back to St. Croix. And because, again, nobody is parenting him, he gets arrested, you know, is the culmination eventually of that. But he has a stutter that makes him ostracized. You know, he has sort of nobody on his side. The teacher is telling this other story of a kid who is desperate for some kind of attention, and it responds to, the child responds to limits and encouragement when she gives it to him. She's tutoring him for his learning disability and for his difficulty in school. And maybe that's not Wiggins, but that's a whole lot different than what trial counsel put forward. I think, for myself, I think you've got a relatively strong case on the performance side, particularly when it comes to not trying to figure out what the mental health evidence was before deciding not to use it, right? That can certainly be strategic. I don't know if it's a winning argument on that prong, but I think you've got a relatively strong argument on performance at the mitigating phase, at the penalty phase. But my concern goes to the prejudice prong of Strickland, because insofar as murders go, I don't want to minimize any murder, this was horrific and brutal and involved torture. And when you have not just one murder like that, but a couple of them combined with prior violent activity, for example, the shooting of the postal worker when he was in his teens during a botched robbery attempt, a pretty lengthy history of disruptions and misbehavior in prison, you put all that together and it starts to become a real hard mountain to climb. So I'd like you to address that if you could. Agree. Prejudice is, I think, the more difficult question here. And to your point, I think his initial early problems as a teenager kind of snowball on top of each other because of the difficult conditions in which he's incarcerated and that he becomes progressively more, his history becomes more aggravated, not just during his incarceration, but because of it. And I think that is an argument that trial counsel could have put forward, that what happened here happened in part because of whatever it was that happened to Mr. Seeley once he gets to prison at age 17. But if we want to take apart, perhaps, would it be helpful to take apart the state habeas court's order as to prejudice and break down the different categories and then consider them as a whole? For my purposes, I don't think you have to. I think if, I know we're not performing de novo review, but for purposes of our discussion, you can just tell me as a de novo Strickland matter, tell me why you think you prevail on prejudice. And on top of that, of course, you have to layer at the deference, but just tell me why on a pure de novo reading, you think you prevail on prejudice. So first there's the mental health evidence, which shows, you know, even with the sort of disputes about what that evidence is and what you can, what kind of conclusions you can draw from that, we know from at least two experts that he has deficits in the kind of things that impact your culpability. He has deficits in reasoning, in complex problem solving, his processing speed is very impaired, Dr. King emphasizes that that was the, that was the proportion of his Stanford-Binet, which was most striking as his processing speed is so low. So he has these high verbal abilities, so he looks as though he's functioning fine, but when it comes time to engage in a complex task or take in new information or make decisions under stress, he cannot do that. So we know that about the way that his brain functions. We know that he had very little in the way of parenting or guidance to help him with those specific deficits, wherever they came from. Perhaps they came from birth trauma, perhaps they came from a head injury, perhaps they came from some other source, but we know that they were there. And then you take that child and keep, you know, kind of upending him from one unhealthy environment to another and then put him into a prison environment that is later, you know, where the conditions are so bad that there's later a consent decree between DOJ and the territory where the DOJ takes over the running of the prisons because they're so bad in terms of staffing and conditions and safety and inmate control. And juvenile inmates like Mr. Seeley would have been housed with adult offenders. And we have testimony from people who knew him on the island and then encountered him in BOP who says that that experience changed him, that he's now a different person coming out. And that is a, you know, that's a completely different thing than what trial counsel put forward. And you have to combine that then with what trial counsel did do, which is raise residual doubt or raise some kind of doubt about exactly what Mr. Seeley's role in the crime was. The co-defendant, I'm sorry, do you have a? No, no, no. The co-defendant, the testifying co-defendant, the only co-defendant who's in the home, Mr. Seeley, you have Ms. Carter playing a substantial role in provoking and encouraging and planning this crime. So the jurors are responding to that, and we know it because they said it, but we also know it because, you know, it wasn't a slam dunk for a sentence. They're out for a while. So you combined the mitigation evidence that trial counsel didn't get in front of this jury, the stutter, the lack of parenting, you know, no, it's not Wiggins, and I take your point, but it's not what trial counsel presented, and on the basis of what trial counsel presented, they were already receptive to a life without parole sentence. The difficulty, I think, for me, just sort of piggybacking on what Judge Jordan was suggesting to you is that in a case like Wiggins or Rompilla, you can sort of see like, okay, brutal murder, but whoa, like look at the stuff that was never put before the sentencing jury. And in this case, and I don't mean to sort of denigrate the evidence, the sort of the evidentiary delta here, but where you have a particularly horrible crime that involves torture and sort of, you know, axe bludgeoning. There's no clean murder, but this was a particularly dirty murder. It just feels like so distant from Wiggins and Rompilla that the distinction almost sort of goes back around on you, if that makes any sense. The distinction is so great that it's hard to imagine that this is the sort of case that warrants upsetting the state court apple cart, I guess. It's an aggravated crime, but it's not a crime that was so aggravated that the district attorney thought that the only right answer could be a death sentence. The district attorney offered a life sentence, and the jury was receptive to a life sentence, and in fact, were looking for a reason to give one. So, you know, however, you know, aggravated it was, it wasn't in some heartland of cases so aggravated that nobody was willing to consider anything other than death. It appeared to me when I looked at the state habeas court's order that it considered prejudice separately with regard to different subclaims, so it analyzed prejudice with respect to the nephew's testimony, and then separately with respect to the mental health evidence. Does that violate Strickland, or more particularly Williams, which says that you have to aggregate all of the potential mitigation evidence against the aggravating evidence? Absolutely. And if so, then what's the impact of that? Yeah, I think that the state court was under duty to consider all of the evidence as a package deal, if you will, the different picture that the jury would have received. And not only that, but it was required to consider all of that evidence together and consider how it would have impacted what trial counsel did present. And now we have two mental health experts testifying that, wow, Mr. Seeley's verbal ability and his presentation is very high, he's actually functioning cognitively, emotionally, and socially much more like a teenager, a 15-year-old. And so when trial counsel is trying to argue that Ms. Carter or other co-defendants are more culpable than what's being led on, and that Mr. Seeley is responding and reacting to their planning and their impetus, well, now suddenly we don't have a teenager and an adult man. Now there are two teenagers functionally in the room. So the residual doubt theory gets better, and the state court gives no attention to that. And the state court, moreover, dismisses the mental health testimony out of hand, you know, with these sort of twin findings that the mental health testimony is A, unsupported by the record, and B, the product of errant analysis. And those two, you know, the district court wants to call that a credibility determination, but those are fact findings that just aren't supported by the record. I mean, to the extent that the current diagnoses are supported by the testimony of a renowned neuropsychologist, they have support in the record. You know, what weight a jury would give to each of those experts respectively is a different question that the state court was entitled to consider, and we think considered wrongly. As to being the product of errant analysis, that's not really the whole story either. That's not what the record shows. Can I ask you just one question, back to Judge Pryor's question, because I genuinely don't understand how this works. So in aggregating the mitigating evidence for purposes of conducting the prejudice analysis, right? I don't want to call it cumulative error because it's got like all kinds of baggage attached to it. But you know what we're getting at. Absolutely. Do you only count the mitigating evidence that is the product of deficient performance? So for instance, in this silo, it's failed to put on the mental health evidence. If we find that that was deficient performance, then we put the mental health evidence into the kitty. Then there's Tutine, and if we find that that was deficient performance, then we put him into the kitty. Is that how it works? We don't consider stuff, I guess, in aggregation that wasn't the product of deficient performance. Is that right? I would agree with that. Yes. If there's no deficiency, I mean, that's, you know, there are two prongs. You tally up the prejudice that results from deficient performance, basically. Correct. We have to meet a burden as to two prongs. Perfect. Got it. Okay, good. I just want to make sure I understood. I'm actually not sure that's right. I think we take the mitigation evidence adduced during post-conviction and add that to whatever mitigation evidence was presented. Of course, here there's very little. I agree with that. I thought that Judge Newsom was talking about whether first we had to meet Strickland's first prong with regard to the failure to adduce a given item in order to put that item in the whole sort of Strickland-Porter prejudice bin. Yes. Am I getting it? I think they're not inconsistent. Yeah, I think we're talking about the same thing. Okay. Because, for example, something very different than here, but it's a hypothetical. A lawyer, after proper investigation, makes a reasonable strategic decision to not put on certain evidence. If that finding is correct, if that holding is correct, you don't take that evidence and then weigh it against the aggravating evidence and the mitigating evidence that was presented. You need some sort of a deficient performance finding to consider the evidence that was not introduced. Right? I agree with that. I was proceeding on the assumption that we were at deficient performance in addressing the prejudice questions. Yeah, that's good. I wanted to talk in more depth about the mental health testimony and why the would-be conflicts are not actually all that great between the two experts, but I will say— You can have a couple of more minutes, and I'll give your colleague on the other side the same extra amount of time. Thank you, Judge Jordan. I think we should be clear about where there are areas of difference between Dr. Pointe and Dr. King. The first bucket I will call the waste bucket. Dr. King says Dr. Pointe made these scoring errors on a specific subset of the waste, and that therefore his waste score is illegitimate, and we should throw it out. There's conflicting testimony about that. Dr. Pointe says, I know how to administer a waste, I've done it for 25 years, but even if you take Dr. King at his word and throw out Dr. Pointe's waste, we have Dr. King's And for Binet, which says his IQ is only an 82, and it's being drugged up to an 82 by these strong verbal abilities, and it shows specific deficits. And by purportedly the performance effect of taking the test more than the first time. Absolutely. So bucket two is what I'll call nomenclature differences. Dr. King says, I don't know what organic brain syndrome is, I don't know if I would call this dementia due to multiple etiologies, he sort of takes issue with what we're calling it. That's bucket two. Bucket three is Dr. Pointe says he's functioning very low from a social and emotional perspective, that he's more like a teenager in his actual real world functioning. Dr. King says, I don't know. So that's the first three buckets. But the fourth, the fourth is where it's at. Dr. Pointe gives 50 neuropsychological tests that test very specific tasks, very specific cognitive abilities. Some of those, Mr. Seely is fine, some of them he is above average, but some of them and the ones that really matter, his complex problem solving skills, his working memory, which is different than short term or long term memory, his working memory, which is what allows you and I to have this conversation and solve problems and think things through. That's impaired, his processing speed is impaired. And for those 50 tests, there is no rebuttal in the record. When Ms. Graham is cross-examining or is performing the direct examination of Dr. King and tries to ask him about what conclusions can be drawn from one of those neuropsychological tests, Dr. King says, I'm sorry, I'm not familiar. And that's because neuropsychology is not his area of expertise. He's qualified to give the Stanford Binet, but he can't respond to these 50 tests that show that he has very specific cognitive impairments. And so for the state habeas court to say that these are the product of, quote, errant analysis and toss them aside completely is an unreasonable application of Strickland, you know, per reporter V. McCollum, per other decisions of this court. And there's no weighing of that. There's no weighing even of the deficits that Dr. King says that he has. So I realize I am considerably over the additional time you generously gave me. We've given you the extra time, so you've saved your full time for rebuttal. Thank you. Thank you very much. David. David. Could you give me the blue brief? Give me the blue brief, please. Ms. Graham, whenever you're ready. Thank you. Good afternoon. May it please the court. My name is Sabrina Graham. I'm here on behalf of the responding asking that this court affirm the district court 's denial. So I'd like to address all the things that were just talked about there a lot. First, let's go to the mental health evidence, since that was the last topic that was before this court. I would— But you've got a little bit of a problem, at least, with regards to performance. I mean, when you've got a doctor, first of all, you've got a horrific murder with substantial evidence of guilt, which would lead any lawyer, including these lawyers, because they said to think, okay, I've got to start thinking penalty phase. And then you have a doctor. It's not just your interaction with your client, but you have a doctor telling you, I think he's got these issues. Some of them are significant. I recommend this sort of testing. You have notes from the lawyers saying, need to do this testing, and then there's no testing done. That's a problem, right? Well, actually, I would disagree with you on that, Judge Jordan, because trial counsel testified that they did have Dr. Farrar go in and evaluate him. And trial counsel said that they spoke with Dr. Farrar after that particular evaluation. I don't think there were any psychological tests administered, so I'm not implying that at all. But trial counsel stated that from that, they did not see any reason to investigate further. They said that— That's got to be unreasonable as a matter of law. I don't think that would be unreasonable. How do you know not to proceed before you know what you have? When a medical professional is telling you, you've got these significant red flags, do a little bit more. In other words, if the testing had come back and said, he is mentally disabled under Atkins. He is incompetent to proceed. He has this sort of organic brain damage that prevents him from determining between right and wrong. The lawyers would have been faced with a very different decision, right? And there's a fair amount of Supreme Court case law that says you can make strategic decisions that, you know, judges and courts shouldn't question, but usually only after you've figured out whether that's a reasonable alternative or not. And that's my concern in this case, not on the prejudice prong, but the performance prong. Sure. And again, I would say that trial counsel did make a reasonable decision. There's no testimony from trial counsel that Dr. Farrar told them that he had these issues. And when you look at the remainder of the evidence regarding Seeley's background, you see not someone who had an impoverished childhood, not someone who had a mental health history. They have tons and tons of records from the prison system. There's nothing in there on mental health. They speak to him many, many, many times. They see nothing there to suggest to them that there's anything. And they never testify that Dr. Farrar actually told them that. So where, just so I'm clear, I've just got a quote written down in my notes, but where does, where does the quotation come from that, in my opinion, there was something very, very wrong with Seeley, that he suffered from some kind of delusional, paranoid kind of disorder, perhaps even psychosis, and that further tests should be done? Where's that come from? That comes from Dr. Farrar, I think, at the state habeas evidentiary. So you're saying that the only sort of problem here is that there's nothing sort of, there's no like smoking gun in counsel's notes that they told him this or something? Correct. What did, according to your view of the evidence or the record, what did Dr. Farrar tell them? Because he had to tell them something after they sent him to examine him, right? Well, trial counsel just says that they, he didn't tell him anything that suggested to him that he needed to go further. What did Dr. Farrar testify at the state habeas hearing that he told the lawyers? What Judge Newsom just stated. Okay, so, so whether there's documentation at the front end or not, that might be a fact finding issue. But there's testimony from Dr. Farrar that he told them, there are these issues, at least at the surface level, you need to do something more. But that's assuming that the state habeas court credited Dr. Farrar and he did not credit trial counsel, because the state habeas court, What does the state habeas court do? The state habeas court doesn't mention Dr. Farrar, the state habeas court found they did a thorough investigation into mental health, therefore, and it doesn't exactly go into a lot of detail about that, but you could say, is there any reasonable basis for that? And any reasonable basis could be that Dr. Farrar did not tell them that as trial counsel did not testify. That's what it saw. And trial counsel was adamant over and over, oh, I'm sorry. No, no, I'm sorry. I shouldn't have interrupted you. Go right ahead. Go right ahead. So, trial counsel was very adamant, I mean, to the point of stating, exclamation point, I did not see any mental health here that needed to be investigated further. I have only so much time, so much money, and so many resources. I chose not to go down that path. I thought he had funds for a mental health expert. He did. And didn't use them. He did. He did use some of those funds for, because Dr. Farrar did go and speak with Ms. O'Sullivan. Right, and he had funds for mental health evaluation afterwards, but didn't use them, so it wasn't like he ran out of money. I'm sorry. I didn't mean to imply that. All I mean to imply is that, that was Mr. Beal's testimony, that these are the resources I had, I chose to use them the best way I could, and I did not see this as an avenue to go down. But having stated that, if this court, you know, if you assume that they were deficient in some way, I don't understand how you could say that no reasonable jurist would have found prejudice in this case, would not have found prejudice. In this particular case, they make out that Petitioner had a chaotic childhood, that he was neglected by his parents, and things of that nature. But when you look at the record, there's contradictory evidence to that. First of all, the issue of chaos comes from Dr. Puente. And when Dr. Puente was specifically asked, you know, where is this chaos you're coming from? Well, the mom moved him when he was 12 to New York. There's no actual direct evidence in here showing that he lived in a chaotic home. Dr. Puente didn't even know what his home looked like in St. Croix. He couldn't answer the question, was it chaotic inside? I don't know. But Mr. Seeley told trial counsel, hey, you know, my dad was great. He was loving. He never beat me. My mother was really strict. My dad would step in if she would get to me too much with the wire. But there was no evidence from Mr. Seeley that his family was neglectful. And in fact, he even told trial counsel that his father came to all of his games. They make much about the fact that, you know, people kept saying in the affidavits, we never saw his family at the games, but that's not what Mr. Seeley told trial counsel. So there is very little evidence that he had any kind of impoverished, neglected, chaotic childhood. It's not unusual for parents to split up and for the parent to move away. There's no testimony regarding what happened in New York, why it was chaotic up there. There's nothing about that. All we have is Dr. Puente going to see his mother many years later, and he diagnoses her with dementia and relying upon that information. There's nothing in the school record showing that. There's nothing in the prison record showing that. So all that evidence that he had this terrible, chaotic childhood isn't supported in the record, and that's what the state habeas court found. And they make out that he had a stutter. Yes, he had a stutter when he was a child. There's no evidence that he had a stutter when he was grown. And trial counsel said specifically that, hey, you know, are we going to put up that he had a stutter to this jury after the horrible crime that he committed? And you just keep going with it. And I mean, when you dig down into what Dr. Puente is actually stating, there's just nothing there. And Dr. King does refute the fact that he has organic brain damage. He specifically says, no, I don't find that. And he specifically says, I don't think he has borderline intelligence, because when you look at his general fund of knowledges, it's around average. So, you know, maybe you get Dr. Puente up there to testify that trial, but the state could also come in and present somebody like Dr. King who does refute Dr. Puente's testimony. Sir, can I ask you a question? What do we do with the fact, I think my understanding of the state habeas court's order is correct, that there was, I mean, presumably Puente and King were kind of going toe-to-toe at the state habeas hearing. And at least with respect, so far as I can tell, maybe only to the issue of mental retardation in particular, the state habeas court seems to make what I would call a factual finding that King is more credible than Puente. But does that factual finding sort of extrapolate to what I would call non-mental retardation evidence? Or were there issues other than mental retardation specifically where there was this finding about who's more credible? Well, I do think that it also, I agree, because when the state habeas court, in the order he talks first about the intellectual disability, and then he talks about the organic brain syndrome. And in that one, he says he doesn't credit Dr. Puente because Dr. King testified that his testing of the waste was unreliable. And then he goes on to say, when he talks about the organic brain syndrome, that the evidence of chaos and those type of things that Dr. Puente testified to weren't substantiated in the record. So I think he's also making a credibility determination there as well. I see. So it's not necessarily a King versus Puente, it's just about Puente. Right. Got it. Okay, I understand. What about Ms. Benton's point that she says that there was no rebuttal in the record to the 50 neuropsychological tests that Dr. Puente administered? Well, what Dr. King testified to was that when you look at these tests, he thought they were consistent with his, that he was overall normal on most of the tests, and that did not show that he was in fact had organic brain damage or he had brain damage. He said, but yes, he did have a learning disability. He had with arithmetic. He did disagree with him on that. From my understanding of what Dr. King was stating now, and Dr. King also stated when he was questioned about the emotional immaturity, he said, I don't know what you're talking about. And I do believe, and I do apologize if I misrepresent, I just read that Dr. King stated that he did not think he was acting like a teenager. And I would like to go back and address that particular issue where they state that they could have put up evidence that he was functioning as a teenager and that he was this easily led person. That is, could absolutely be refuted by the state in this record. This man was a predator. He was a predator when he was 17 years old, and he shot that man in the back that he was trying to rob. He went into the prison system, and when you look at all of his prison records, what does it say in the prison there on St. Croix? It says that he was the one who was trying to incite a riot. It says that he escaped. He was a troublemaker. He was a troublemaker so many times when he got in the Federal Bureau of Prisons that they transferred him four times for being a disciplinary problem. This guy was a complete predator in prison. He comes out of prison, and he continues that behavior. He tells trial counsel, oh, I worked over at the mall here in Atlanta, and I had a lady bring me credit card receipts. And I would take those credit card receipts, and I'd take trips down to Miami. And then what does he say? Oh, he had this little gang of people that he heralded over, teenagers, over there in Little Five Points. This wasn't a man who was easily led. This wasn't a man who was functioning at the age of a teenager. This was a man who was preying upon teenagers. He preyed upon teenagers all the time. And the idea that Mr. Fahey is saying that D'Andrea, the 15-year-old, was telling him what to do in there, that's not exactly what happened at all in that particular testimony. I mean, Mr. Fahey said that D'Andrea did certain things, but she didn't say that he was leading Seeley during this crime. There's absolutely no evidence in here that Mr. Seeley is an easily led man who is functioning like a teenager. The evidence here shows more likely that he was, in fact, the predator in this case. What was the testimony at the state habeas hearing with regards to the willingness of Mr. Seeley's mother to testify or not testify? What trial counsel stated, you had two different, you had Mr. Roberto and Mr. Beal. And Mr. Beal stated, yeah, from what he understood, they didn't want him to contact the mom, but he would have contacted the mother anyway. And Mr. Seeley did give him the phone number and address of where his mother was. Mr. Roberto testified, and he was the one who was more in charge of mitigation than Mr. Beal. Was he the one who traveled to St. Croix? He did travel to St. Croix. I thought Mr. Beal did too, but anyway, Mr. Roberto stated that Petitioner's sister, Geraldine, and Mr. Seeley both told him that if you contact the mother, we're not going to cooperate with you. We're not going to give you any information. That was the information. But as far as whether or not they actually contacted her or not, I don't think that they did. And there wasn't any testimony, even in state habeas, that she would have come and testified at trial. They didn't present any testimony from her. Affidavits? Affidavits or anything else either? No. From her? Okay. No, just the hearsay testimony from Dr. Puente when he went to interview her there in the Bronx. Assuming we could get to de novo review, what do you make of the fact that these jurors testified that they just wanted to hear something, anything in mitigation, and that it might have made a difference? Well, I don't think that's an appropriate, I don't think it's appropriate to look at what the jurors stated under Strickland. I do think it is a weighing process. I also would point the court to the state habeas court's order, and I just briefly reviewed it. It's on page 44, where it talks about the court allows a juror's testimony in regarding the extrajudicial information regarding the Bible, but then for any other evidence of juror misconduct, the court goes on and explains that you can't use the juror's affidavit for impeachment purposes. So to the extent that they're attempting to use that to impeach their own verdict and say we would have considered this, then I think that has not been admitted by the state habeas court. But putting that aside, I still think that you have to do a weighing, and it's not up to the jurors to come in and say, well, maybe if I'd given some information, I might have changed my mind. It doesn't show it here what information they were given, if they were given all of the Dr. King, all of the prison records that he had, if they had been given all of that, would they have changed their mind? I don't see that in their affidavits there. Can we take into account the divided vote? That's usually taken into account in other criminal appellate scenarios when you're trying to look at whether or not an error during the course of trial might have caused prejudice. And so you're right that you can't take into account what was going on in between the jurors, but if the foreperson happens to report to the judge, judge, we're split six to six on guilt, and we've gone through 17 votes, and we're still split six to six. That's a factor that a court may look at if it's doing de novo review to figure out whether or not any error that occurred during trial might have swayed the verdict one way or another. Sure. I think that, I don't know of any Supreme Court precedent that says that you look at this split, but that's assuming that jurors only move in one direction. And this court has specifically stated that you can't assume that a juror is only going to move towards life without parole. They could have heard all of the evidence from the state and said, you know what, that makes me even more sure that I want to vote for death. So I think that to that extent, it just can't be assumed that those six people who were on the side of life without parole would have automatically gone to life without parole if they had been presented with this weak mitigation evidence. And ultimately, that is, I think, Respondent Strong's argument here, that the evidence is weak when compared to the crime. It does fall in the realm of mitigating evidence, and certainly we're not saying that Dr. Puente's testimony or the family's testimony isn't mitigating, but it does not mitigate this particular crime. It doesn't explain it in any way whatsoever. I mean, if he had had a mental health disorder that we had delusions or hallucinations or something truly affecting him, you could understand that. But this is a crime where he went and, I mean, you know the facts of the crime. I won't repeat them, but they are horrendous. And there's nothing in any of this, their new mitigation evidence, that explains what he did in a manner that shows that the state habeas court's decision was unreasonable under Supreme Court precedent. I have one question, born more out of curiosity than anything else. Was there any evidence presented at the trial as to why Mr. Seeley thought that there was so much money in the home? Well, Mr. Toobner, he wore a lot of rings and jewelry. He had several vehicles. And the jeweler testified at trial that, Mr. Toobner's jeweler testified that he always had on all these, all this jewelry, and then it gave the wrong impression of how much wealth he had. I see. But other than that, no, I'm not aware of why they thought that, why he thought they had money or didn't have money. All right. Thank you. Could I ask you before you sit down, just to make sure I'm clear, about the different So, on, so there was a subclaim about the failure to proffer the polygraph results. And I have that the state court made a merits decision on deficient performance on that one, but not on prejudice. Is that correct? Well, the way that I read the state habeas court's order is it specifically says they weren't deficient, but then the court states that the evidence would not have, it wasn't reliable enough to be admissible. So our argument is that that's an implicit prejudice argument, because if it wasn't admissible, then you can't show a reasonable probability of a different outcome. Okay. And then what about the failure to call Tutane at the penalty phase? As I saw it, there was no state court merits decision on deficient performance, but there was on prejudice. Is that correct? Correct. That's correct. All right. And then for the failure to present mental health mitigation, it looks like we would owe Ed Pedeference on both prongs of Strickland on that one. I'm sorry. Can you repeat the last part? Yeah. It looks like there was a state court merits decision on both deficient performance and prejudice on that one. And then I thought the most confusing one was the aspect about background and family life and so forth. Was there a merits decision on both deficient performance and prejudice, or just deficient performance? I thought it was on both, but if I'm wrong, I'm wrong, but I understood it to be both of them because he found that, I'm thinking about it, sorry, he talks all about trial counsel trying to get the family up there and talking to them, and he definitely says they weren't deficient. I thought there was a prejudice analysis. Okay. Thank you. Unless the court has any other questions, I think I've tried to address everything that the court has asked, and I will sit down and ask that the court please affirm the district court's decision. Thank you. All right. Thank you very much. Ms. Fenn. If I could briefly just address a couple of things with respect to deficiency because we didn't talk that much about it. There is evidence that Dr. Farrar told Mr. Beale of his findings, and that quote that does in fact come from Dr. Farrar, I think it was you, Judge Newsom, who raised the quote, it comes from Dr. Farrar, but it also comes from Mr. Beale, who in an August 3rd, 2001 ex parte hearing tells the trial court that he needs money for the evaluation because Dr. Farrar's preliminary take is that he has a serious neurological problem or an organic brain problem and possibly a delusional disorder. So we know that Mr. Beale knew because he told the trial court. And then he tells them again at another hearing that they still haven't done the testing. That's right, Your Honor. And then as late as July of 2002, which is a full year later, and just a few weeks before trial, Mr. Beale's timesheets show that Dr. Farrar is still calling him and leaving messages. But Mr. Beale doesn't have corresponding time entries where he's calling Dr. Farrar back. So Dr. Farrar is clearly still trying to get in touch and say, can we move forward or what's going on? And Mr. Beale says nothing, apparently. With respect to the prejudice from the mental health experts, all of what Ms. Graham said about Mr. Seeley's history and his behavior, that was in front of this jury already. Nothing about the mental health testimony would have provoked that. It was already out there. There's no downside to telling the jury or trying to explain to the jury why this behavior is what it is and tell his story. The idea that two experts are fighting over what to call the deficits that they agree he has, the idea that two experts are fighting over how severe those deficits are, is a far cry from a jury who thinks there's nothing wrong with him at all and who's already heard about his prison behavior. Moreover, his deficits do have something to do with this crime. He thinks there's a million dollars in the house because Ms. Carter told him that, because it was Ms. Carter's idea to go to the house to get the money. She gained access for them. She was the one who knew the victims. She's the one who encouraged him. Page 2295 of Fahey's testimony, she's telling him, you've got to do it. You have to kill them. That was never part of the initial plan. She plans it, and then she's encouraging the crime as it's ongoing. And because he has these deficits, he can't look around and say, this is not a house where there's a million dollars hiding. He doesn't have the processing speed. He doesn't have the problem-solving ability. So they do. They might not explain entirely, but they certainly have something to do with what happened here. With respect, just briefly to wrap up with respect to the juror testimony, I would submit that while the state habeas court ruled that any testimony that impeaches the verdict couldn't come in, this is something else entirely. These are jurors explaining why their verdict was what it is. They're not undermining the verdict they rendered. They're explaining and justifying it and saying we entered it because we were given no mitigating evidence. And that, I think, is something different, slightly, than impeachment. But again, even if you're not with me on that and you think that these are inadmissible, the jurors are simply stating what the case authorities already tell us, which is you send a message to a juror that they don't really have any choice and that the defendant is irredeemable if you don't put up something. Further questions from the court, I will yield back the time that I was given by Judge Jordan. We would ask that you reverse the decision of the district court and grant Mr. Seeley sentencing phase relief. All right. Thank you very much. Thank you both. It's been very helpful. Thank you. And we want to acknowledge that the firm of Baker and Haas Flutter have been working with the Federal Defenders Program in representing Mr. Seeley, and we want to thank you for your efforts on behalf of him and your service to the court. We really do appreciate it. We're in recess. Thank you. All rise.